UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ATLANTIC SALMON FEDERATION U.S., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 1:21-cv-00257-JDL ) |
| MERIMIL LIMITED PARTNERSHIP, et al., | ) ) ) |
| Defendants. | ) ) |

**ORDER ON DEFENDANTS' MOTION TO STAY CASE OR EXTEND SCHEDULE**

Defendants Merimil Limited Partnership, Hydro-Kennebec LLC, Brookfield White Pine Hydro LLC, and Brookfield Power US Asset Management LLC filed a motion (ECF No. 51) to stay this case until the National Marine Fisheries Service ("NMFS") issues a biological opinion concerning proposed amendments to the licenses of the four hydroelectric dams at issue in this litigation and the proposed relicensing of one of those same dams. In the alternative, the Defendants request a 60-day extension of the deadlines in the Scheduling Order (ECF No. 46). For reasons that follow, I deny the request to stay the case and grant the request to extend the deadlines.

**I. BACKGROUND**

Substantial background about this Endangered Species Act ("ESA") litigation involving the endangered Gulf of Maine Distinct Population Segment of Atlantic salmon ("Atlantic Salmon") and the four dams at issue appears in my recent order (ECF No. 59) denying the Motion for a Preliminary Injunction (ECF No. 10) filed by

1

Plaintiffs Atlantic Salmon Federation U.S., Conservation Law Foundation, Maine Rivers, and the Natural Resources Council of Maine. *See Atl. Salmon Fed'n U.S. v. Merimil Ltd.*, 1:21-cv-00257, 2022 WL 558358, at *1-3 (D. Me. Feb. 24, 2022). The following additional facts provide the necessary context for this order.

After NMFS initiated its formal consultation in December 2021 on the proposals to amend the licenses at Lockwood Project, Hydro-Kennebec Project, Shawmut Project, and Weston Project and to relicense Shawmut Project, NMFS asked the Federal Energy Regulatory Commission ("FERC") for a 60-day extension. FERC's response to NMFS's extension request is not in the record. If FERC approves the request, the deadline for NMFS's biological opinion would be extended from April 15, 2022 to June 15, 2022. The Defendants would need to consent to any extension beyond June 15. *See* 50 C.F.R. 402.14(e) (2021).

The proposed license amendments that NMFS is studying through the consultation process would require the Defendants to adhere to new species-protection plans at the dams.[1] NMFS's biological opinion about the four license amendments and the relicensing will feed into a second ongoing administrative process: FERC's preparation of an environmental impact statement, due in February 2023, to comprehensively evaluate the environmental consequences of the same proposed actions. *See* Notice of Intent to Prepare an Environmental Impact

---

[1] To describe just a few elements of the proposed plans, at Lockwood Project, the Defendants would need to "construct and operate permanent volitional passage in the Lockwood bypass reach"; at Hydro-Kennebec Project, they would need to "relocate the existing bypass entrance and Worthington boom, increase the capacity of the downstream bypass to 5 percent of station flow, and install an Alden-style weir"; and at Weston Project, they would need to "construct and operate an upstream fish lift adjacent to the existing log sluice" and "modify the downstream bypass by adding an upturned lip to the end of the sluice to dissipate discharge." ECF No. 51-7 at 3-5.

Statement, 86 Fed. Reg. 67931, 67932 (Nov. 30, 2021). This second administrative process is happening under the National Environmental Policy Act ("NEPA"), which requires federal agencies to "include in every recommendation . . . for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement" on "the environmental impact of the proposed action" and "alternatives to the proposed action." 42 U.S.C.A. § 4332(C) (West 2022). The NEPA process will help FERC decide whether the agency wants to pursue license amendments for the four dams and the relicensing of Shawmut in light of the reasonably foreseeable environmental impacts, including but not limited to the consequences for Atlantic Salmon. *See* 40 C.F.R. § 1508.1(g) (2021); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 754 (2004) (NEPA "ensure[s] both that an agency has information to make its decision and that the public receives information so it might also play a role in the decisionmaking process.").

When NMFS agreed to initiate formal consultation, the agency advised FERC that the Defendants' authority to incidentally take Atlantic Salmon pursuant to any incidental take statement that may appear in the forthcoming biological opinion "will not be effective unless and until FERC requires compliance with any [of the incidental take statement's] Reasonable and Prudent Measures and Terms and Conditions through enforceable terms in the amendment of licenses and/or the issuance of a new or subsequent license." ECF No. 51-12 at 3. And, according to NMFS, "FERC cannot proceed with any licensing decision or the amendment of existing licenses until the conclusion of its responsibilities under the National Environmental Policy Act." ECF No. 60-1 at 2. NMFS has also informed FERC that, "[s]hould one or more of your

3

proposed actions change because of your findings in the [environmental impact statement], it is likely that we will need to reinitiate ESA consultation to consider the effects of the modified action(s)." ECF No. 51-12 at 2-3.

## II. STAY REQUEST

The Defendants first argue that I should stay this case pursuant to the primary jurisdiction doctrine. "The doctrine of primary jurisdiction is a prudential doctrine developed by the federal courts to promote accurate decisionmaking and regulatory consistency in areas of agency expertise." *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*, 196 F.3d 302, 304 (1st Cir. 1999). "[I]f a court concludes that an issue raised in an action before the court is within the primary jurisdiction of an agency, the court will defer any decision in the action before it until the agency has addressed the issue that is within [the agency's] primary jurisdiction." *Id.* (quoting 2 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* 271 (3d ed. 1994)).

"[T]here is 'no fixed formula' for applying the primary jurisdiction doctrine . . . ." *Conservation L. Found., Inc. v. Exxon Mobil Corp.*, 3 F.4th 61, 72 (1st Cir. 2021) (alteration omitted) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)). Nevertheless, the First Circuit has "recognized three principal factors that guide whether to defer a matter to an agency: '(1) whether the agency determination lies at the heart of the task assigned the agency by Congress; (2) whether agency expertise is required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court.'" *Id.* (alterations omitted) (quoting *Massachusetts v. Blackstone Valley Elec.*

*Co.*, 67 F.3d 981, 992 (1st Cir. 1995)). "[T]he third [*Blackstone*] factor can outweigh the other factors, and sometimes greatly so." *Id.* at 73. "After considering the *Blackstone* factors, we balance them 'against the potential for delay inherent in the decision to refer an issue to an administrative agency.'" *Id.* at 74 (quoting *Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Env't Prot.*, 163 F.3d 74, 81 (1st Cir. 1998)).

    The Defendants assert that the three *Blackstone* factors favor a stay until NMFS issues the biological opinion. The Defendants also argue that a stay pursuant to the primary jurisdiction doctrine is especially appropriate because the issuance of the biological opinion may moot this case. More specifically, the Defendants reason that the Plaintiffs' claims are predicated on the Defendants' lack of incidental take authority and that the issuance of a biological opinion with a new incidental take statement would cure that deficiency, if the taking complies with the statement's terms and conditions. Finally, the Defendants argue that the Plaintiffs' interests would not be harmed by the requested stay because the next migration season for Atlantic Salmon will not begin until April 1, 2022, so the overlap between the stay and migration season would be short. The Defendants also state their intention to take voluntary steps during the upcoming migration season to protect out-migrating Atlantic Salmon.

    The Plaintiffs respond that the primary jurisdiction doctrine does not call for a stay here because this litigation is about the ongoing unauthorized take of Atlantic Salmon, not the specific terms governing the Defendants' incidental take permit. As such, waiting for NMFS to unravel the intricate and technical facts that pertain to the terms of a future incidental take statement would not materially aid my decision-

making. Additionally, the Plaintiffs predict that NMFS and FERC will agree to extend the deadline for the biological opinion, which would extend the length of the requested stay. Finally, the Plaintiffs argue that they and Atlantic Salmon are prejudiced every day that unauthorized take continues to occur.

Turning to the *Blackstone* factors, the first two point toward deference. First, NMFS is tasked with determining whether amending the licenses and relicensing Shawmut—which would incorporate the new species-protection plans into the dams' licenses—would result in incidental take, whether that incidental take would jeopardize the continued existence of Atlantic Salmon, and what measures would minimize take. *Atl. Salmon*, 2022 WL 558358, at *2-3. Second, these are highly technical matters requiring agency expertise. However, on these facts, those first two *Blackstone* factors are strongly outweighed by the third—whether the biological opinion would materially aid the resolution of this action—because there are substantial differences between the questions at the heart of this litigation and the answers that NMFS will provide in the forthcoming biological opinion.

Because Plaintiffs seek declaratory and injunctive relief related to the alleged ongoing and unauthorized take of Atlantic Salmon by the four dams, the Plaintiffs' claim depends on whether the dams, as they currently exist and operate, take Atlantic Salmon; whether the dams threaten more than a negligible harm to Atlantic Salmon as a whole; and whether the Plaintiffs' proposed injunctive relief would provide more than a negligible benefit to Atlantic Salmon as a whole. *Id.* at *4, *7-8. Thus, there are at least three key distinctions between my inquiry and NMFS's. First, the Court will examine the effects of the dams' current operations, while NMFS

is examining the effects of amending the dams' licenses to establish a new-and-improved operating regime. Second, the Court will examine whether the dams are causing more than a negligible harm to Atlantic Salmon as a whole, including to recovery, while NMFS is examining whether the proposed amendments and relicensing will jeopardize the continued existence of Atlantic Salmon, which is effectively a question of extinction. *See* 50 C.F.R. § 402.02 (2021) (defining "jeopardize the continued existence of" to mean appreciably reducing the likelihood of both survival and recovery). Third, the Court will examine whether the Plaintiffs' proposed injunctive relief will create a non-negligible benefit for Atlantic Salmon as a whole, while NMFS is examining how to minimize take incidental to the five proposed actions. These differences distinguish this case from others in which courts had reason to believe that the issuance of a biological opinion would simplify their work. *See, e.g.*, *Wild Fish Conservancy v. Irving*, No. 2:14-CV-0306, 2015 WL 11117847, at *5 (E.D. Wash. Apr. 26, 2015). Although it is possible that NMFS's analysis could touch on the topics that I must address, that possibility is pure speculation—as is whether such analysis by NMFS would materially aid my work.

The First Circuit recently provided guidance on how to apply the *Blackstone* factors when the issues to be addressed by the court and the agency are distinct. *Conservation L. Found.*, 3 F.4th at 72-74. In *Conservation Law Foundation*, the plaintiff challenged the defendant's compliance with a Clean Water Act permit, and the district court granted the defendant's request for a stay until the Environmental Protection Agency ("EPA") addressed the defendant's application for a new permit. *Id.* at 65-66. Reversing the district court, the First Circuit concluded that the third

7

*Blackstone* factor was "especially salient" in part because "[w]hether and on what terms EPA issues the [new] permit . . . seems to us largely irrelevant to whether [the defendant] has violated the conditions of the permit currently in effect." *Id.* at 73. Although there was some chance that the agency's analysis of the new permit would help the district court, the First Circuit deemed this possibility "wholly speculative" and not enough to "'materially' help the district court." *Id.* at 73-74.

The same is true here. NMFS's analysis of a proposal to transition the dams to a more salmon-protective operating regime has little bearing on my analysis of what harms are caused by the status quo and whether anything should be done about those harms between now and the date that the Defendants, if successful in the administrative process, restore their incidental take authority. As such, there is little justification to wait for NMFS to issue the biological opinion, and the risk that my own analysis would conflict with the agency's, while possible, is not substantial.

Moving on to the balancing of the *Blackstone* factors against the potential for delay, "[s]ince the *Blackstone* factors do not weigh in favor of the stay . . . , any potential delay only furthers [the] view that the stay [is] unjustified." *Id.* at 74-75. Regardless of how long the stay would overlap with the next migration season, staying this case until April, June, or later would freeze the discovery process and thus prejudice the Plaintiffs by delaying their remedy, if they are due one, for however many months it takes NMFS to issue the biological opinion. Although the Defendants state that they will take precautionary measures to protect Atlantic Salmon at the dams during the upcoming migration season, there is no record evidence of how effective these measures were last year or how effective they will be this year. Also,

8

delay is counter to my conclusion, on the preliminary-injunction record, that the Plaintiffs are likely to succeed on the merits of their unauthorized-take claim.[2] *See Atl. Salmon*, 2022 WL 558358, at *5-6.

I am also not persuaded by the Defendants' mootness argument because I cannot assume that the biological opinion will contain an incidental take statement that would restore the Defendants' incidental take authority. The biological opinion may not include an incidental take statement if (1) NMFS determines that the proposed actions (the amendments to the licenses and the relicensing) are likely to jeopardize the continued existence of Atlantic Salmon and (2) NMFS cannot develop any so-called "reasonable and prudent alternatives" to the proposed actions that would not also cause jeopardy. *See* 16 U.S.C.A. § 1536(b)(3)(A), (4) (West 2022); 50 C.F.R. § 402.14(h)(2), (i)(1). Thus, there is no guarantee that NMFS's biological opinion will contain an incidental take statement because the agency may conclude that there is no way to amend the dams' licenses and to relicense Shawmut without jeopardizing the continued existence of Atlantic Salmon.[3]

---

[2] In addition, if FERC agrees to extend the deadline for the biological opinion to June, the availability of future extensions would be contingent on the consent of the Defendants. As such, the Defendants may have the ability to influence how long this litigation is delayed.

[3] The Plaintiffs have not responded to the Defendants' argument that this case would be mooted immediately by compliance with the terms and conditions of a new incidental take statement, if such a statement appears in the biological opinion. The Defendants concede, however, that they are directly contradicting NMFS's interpretation of the ESA, a statute that the agency administers. As already mentioned, NMFS has explicitly advised FERC that the Defendants' incidental take authority "will not be effective unless and until FERC requires compliance with any [of the incidental take statement's] Reasonable and Prudent Measures and Terms and Conditions through enforceable terms in the amendment of licenses and/or the issuance of a new or subsequent license." ECF No. 51-12 at 3. Because it is unknown at this point whether the biological opinion will contain an incidental take statement, I do not decide whether the Defendants or NMFS is correct.

For these reasons, I conclude that a stay is not appropriate under the primary jurisdiction doctrine.

Finally, the Defendants argue that even if a stay is not justified under the primary jurisdiction doctrine, a stay is appropriate given the "(1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party without a stay; and, (3) judicial economy." *Good v. Altria Grp., Inc.*, 624 F. Supp. 2d 132, 134 (D. Me. 2009). Such a stay would be incidental to the Court's inherent power to control its docket. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). In addition to the Defendants' already-mentioned points about the lack of prejudice to the Plaintiffs and the benefits of waiting for the biological opinion to issue, the Defendants add that they would be prejudiced by having to defend this lawsuit while also navigating the administrative process for the biological opinion.

I have already concluded that the Plaintiffs would be prejudiced by a stay and that the judicial economy benefits of waiting for NMFS to issue the biological opinion are speculative. Additionally, the burden of having to simultaneously litigate and coordinate with federal agencies is "not . . . particularly onerous." *Wild Fish Conservancy*, 2015 WL 11117847, at *4.

For these reasons, I conclude that a stay pursuant to my inherent authority would not be equitable.

### III. EXTENSION REQUEST

In the alternative, the Defendants request a 60-day extension of the discovery deadlines set out in the Scheduling Order. They argue that this additional time is necessary for them to respond to the anticipated discovery requests from the

10

Plaintiffs and to give the Defendants sufficient time to identify experts and prepare expert reports. The Plaintiffs respond that the Defendants have failed to explain the necessity of an extension with the detail required under District of Maine Local Rule 16.2(e), the Defendants had 60 days' notice before the Plaintiffs filed this suit, the Defendants can move for an extension later if responding to the Plaintiffs' discovery requests proves onerous, and the Defendants and their experts are already familiar with the subject matter of this lawsuit. The Defendants counter that their explanation is sufficient, they have not yet retained any experts, and that they had no obligation to jumpstart the discovery process before this case was filed.

Given the complexity of the issues in this case, including whether the dams' operations threaten more than a negligible harm to Atlantic Salmon as a whole, I find that a 60-day extension is warranted. Such an extension will promote the accurate resolution of this litigation by giving the parties additional time to prepare expert testimony on the matters that I recently identified as significant in my order denying the Plaintiffs' request for a preliminary injunction.

## IV.  CONCLUSION

The Defendants' Motion to Stay Case or Extend Schedule (ECF No. 51) is **DENIED IN PART** with respect to the requested stay and **GRANTED IN PART** with respect to the requested extension.

SO ORDERED.

Dated:  March 30, 2022

_____/s/ JON D. LEVY_____
CHIEF U.S. DISTRICT JUDGE
